Tionna Dolin (SBN 299010)
Email: tdolin@slpattorney.com
**Strategic Legal Practices, APC**
1840 Century Park East, Suite 430
Los Angeles, CA 90067
Telephone: (310) 929-4900
Facsimile: (310) 943-3838
emailservices@slpattorney.com

Attorneys for Plaintiffs, PETER SUM,
HONG KONG DIAMOND BAKERY, INC., and
DIAMOND BAKERY, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| PETER SUM, HONG KONG DIAMOND BAKERY, INC., and DIAMOND BAKERY, INC., | Case No.: |
| Plaintiffs, | Assigned to: Dept. |
| vs. | **COMPLAINT FOR VIOLATION OF STATUTORY OBLIGATIONS** |
| FCA US LLC; and DOES 1 through 10, inclusive, | |
| Defendants. | JURY TRIAL DEMANDED |



Strategic Legal Practices, APC
1840 Century Park East, Suite 430, Los Angeles, CA 90067

Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 because the action alleges claims pursuant to 15 U.S.C. §2310, the Magnuson-Moss Warranty Act, with a claim that exceeds the amount in controversy of $50,000, pursuant to 15 U.S.C. §2310(d)(3)(B).

2.     Furthermore, the Court has jurisdiction over this matter because there is minimal diversity as Plaintiffs and Defendants are citizens of different states, with a claim that exceeds the amount in controversy of $75,000, pursuant to 28 U.S.C. § 1332.

3.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Central District of California because a substantial part of the events or omissions giving rise to the claim occurred within the judicial district, including entering into the warranty contract for the Subject Vehicle giving rise to this lawsuit.

4.     Assignment to the Western Division of this Court is proper because much of the events giving rise to Plaintiffs' claims occurred in Los Angeles County.

## GENERAL ALLEGATIONS

5.     As used in this Complaint, the word "Plaintiffs" shall refer to Plaintiffs PETER SUM, HONG KONG DIAMOND BAKERY, INC., and DIAMOND BAKERY, INC.

6.     Plaintiffs are residents of Los Angeles County, California.

7.     As used in this Complaint, the word "Defendant" shall refer to all Defendants named in this Complaint.

8.     Defendant FCA US LLC ("Defendant FCA") is a corporation organized and in existence under the laws of the State of Delaware and registered with the California Department of Corporations to conduct business in California. Defendant FCA's principal place of business is in the State of Michigan. At all

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

times relevant herein, Defendant was engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Los Angeles County, California.

9.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued under the fictitious names DOES 1 to 10. They are sued pursuant to Code of Civil Procedure section 474.  When Plaintiffs become aware of the true names and capacities of the Defendants sued as DOES 1 to 10, Plaintiffs will amend this Complaint to state their true names and capacities.

## TOLLING OF THE STATUTES OF LIMITATION

10.     To the extent there are any statutes of limitation applicable to Plaintiffs' claims—including, without limitation, the Song-Beverly Consumer Warranty Act, implied warranty, Magnuson-Moss Act, and fraudulent inducement by concealment—the running of the limitation periods have been tolled by, inter alia, the following doctrines or rules: equitable tolling, the discovery rule, the fraudulent concealment rules, equitable estoppel, the repair rule, and/or class action tolling (e.g., the American Pipe rule).

### A.     Discovery Rule Tolling

11.     Plaintiffs had no way of knowing about Defendant's wrongdoing with respect to defects affecting the Subject Vehicle until the defects manifested themselves and Defendant was unable to repair them within a reasonable number of repair attempts.

12.     Within the time period of any applicable statutes of limitation, Plaintiffs could not have discovered through the exercise of reasonable diligence that Defendant was unable to repair the defects affecting the Subject Vehicle within a reasonable number of repair attempts until at least after Defendant had failed to repair those defects within a reasonable number of repair attempts.

13.     Making it even more difficult to discover that the Subject Vehicle

Strategic Legal Practices, APC
1840 Century Park East, Suite 430, Los Angeles, CA 90067

suffered from defects was Defendant's issuance of various TSBs and Recalls purporting to be able to fix the symptoms of the defects and/or that such symptoms were not the result of a defect.

14.     Defendant was under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of defects affecting the Subject Vehicle, and the inevitable repairs, costs, time, and monetary damage resulting from the defects.

### B.     The Repair Doctrine

15.     The statute of limitations is tolled by various unsuccessful attempts to repair the vehicle.[1]

16.     Additionally, the limitations period for warranty claims is tolled against a defendant whenever that Defendant claims that the defect is susceptible to repair and attempts to repair the defect.[2]

17.     Here, Defendant undertook to perform various warranty repairs and issued various related repair measures in the form of TSBs and recalls (purporting to be able to fix the defects plaguing the Subject Vehicle).  During the time in which Defendant represented to Plaintiffs that the vehicle was fixable and attempted to fix it, the warranty period may thus have been tolled.

18.     Plaintiffs discovered Defendant's wrongful conduct alleged herein in or about August 2020, when Plaintiffs requested a buyback and/or restitution of the Subject Vehicle from Defendant FCA, as the Vehicle continued to exhibit symptoms of defects following Defendant FCA's unsuccessful attempts to repair

---

[1] See *Aced v. Hobbs–Sesack Plumbing Co.*, 55 Cal.2d 573, 585 (1961) ("The statute of limitations is tolled where one who has breached a warranty claims that the defect can be repaired and attempts to make repairs.") and *A&B Painting & Drywall, Inc. v. Sup. Ct.*, 25 Cal.App.4th 349, 355 (2002) ("Tolling during a period of repairs rests upon the same basis as does an estoppel to assert the statute of limitations, i.e., reliance by the plaintiff upon the words or actions of the defendant that repairs will be made.").

[2] "Tolling during a period of repairs generally rests upon the same legal basis as does an estoppel to assert the statute of limitations, i.e., reliance by the plaintiff on the words or actions of the defendant that repairs will be made." *Cardinal Health 301, Inc., supra,* 169 Cal.App.4th at pp. 133–34.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

them. However, Defendant FCA failed to provide restitution pursuant to the Song-Beverly Consumer Warranty Act and/or Magnuson-Moss Warranty Act.

## FACTUAL BACKGROUND

19.    On or about October 30, 2015, in California, Plaintiffs entered into a warranty contract with Defendant FCA regarding a 2015 Dodge Grand Caravan vehicle identification number 2C4RDGBGXFR669048 (hereafter the "Vehicle"), which was manufactured and/or distributed by Defendant FCA.

20.    The warranty contract contained various warranties, including but not limited to the bumper-bumper warranty, powertrain warranty, emission warranty, etc. A true and correct copy of the warranty contract is attached hereto as **Exhibit A**. The terms of the express warranty are described in **Exhibit A** and are incorporated herein. In addition, to the these warranties, Defendant FCA also provided Plaintiffs with a California Emission Warranty, which Plaintiffs request Defendant FCA produce as part of its discovery obligations in this case.[3]

21.    Pursuant to the Song-Beverly Consumer Warranty Act (the "Song-Beverly Act") Civil Code sections 1790, *et seq.* the Subject Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the vehicle primarily for those purposes. Plaintiffs are "buyers" of consumer goods under the Act. Defendant FCA is a "manufacturer" and/or "distributor" under the Song-Beverly Act.

22.    Plaintiffs justifiably revoke acceptance of the Subject Vehicle under Civil Code sections 1794, *et seq.* by filing this Complaint and/or did so prior to filing the instant Complaint.

23.    These causes of action arise out of the warranty obligations of

---

[3] Upon information and belief, Defendant FCA deliberately refuses to include the terms of the California emissions warranties in its main express warranty booklet so that California consumers are kept in the dark when Defendant FCA fails to comply with its warranty obligations under California's 7 years/70,000 miles emissions warranty, or other California emission warranties, including but not limited to, Low Emission Vehicles warranties (which have an even longer warranty term).

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

Defendant FCA in connection with a motor vehicle for which Defendant FCA issued a written warranty.

24.    Defects and nonconformities to warranty manifested themselves within the applicable express warranty period, including but not limited to the Vehicle's transmission, engine, and/or electrical/TIPM system, among other defects and non-conformities.

25.    Said defects/nonconformities substantially impair the use, value, or safety of the Vehicle.

**Some Of Plaintiffs' Vehicle's Repair History**

26.    The following is a brief summary of some portions of the Subject Vehicle's repair history.

27.    On or about November 17, 2015, with approximately 851 miles on odometer, the Subject Vehicle was presented to Defendant's authorized repair facility due to various concerns including electrical/TIPM issues. In connection with the concerns, Defendant's authorized repair facility performed warranty repairs.

28.    On or about January 30, 2017, with approximately 29,098 miles on odometer, the Subject Vehicle was presented to Defendant's authorized repair facility due to various concerns including engine and/or electrical/TIPM issues, such as warning lights illumination, engine misfires, and HVAC malfunctions. In connection with the concerns, Defendant's authorized repair facility performed warranty repairs, including replacing the engine cylinder(s).

29.    On or about February 8, 2017, with approximately 29,513 miles on odometer, the Subject Vehicle was presented to Defendant's authorized repair facility due to various concerns including ongoing engine and/or electrical/TIPM issues, such as warning lights illumination and engine misfires. In connection with the concerns, Defendant's authorized repair facility performed warranty repairs, including replacing the engine cylinder(s) and coils.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

30.    On or about September 6, 2017, with approximately 41,470 miles on odometer, the Subject Vehicle was presented to Defendant's authorized repair facility due to various concerns including ongoing electrical/TIPM issues, including battery drains. In connection with the concerns, Defendant's authorized repair replaced the battery.

31.    On or about January 11, 2018, with approximately 47,776 miles on odometer, the Subject Vehicle was presented to Defendant's authorized repair facility due to various concerns including transmission and/or electrical/TIPM issues, such as transmission failure. In connection with the concerns, Defendant's authorized repair facility performed warranty repairs, including replacing compounder, valve body, and torque converter.

32.    On or about November 21, 2018, with approximately 67,367 miles on odometer, the Subject Vehicle was presented to Defendant's authorized repair facility due to various concerns including ongoing electrical/TIPM issues, including battery drains. In connection with the concerns, Defendant's authorized repair facility replaced the battery under warranty.

33.    Thereafter, Plaintiffs continued to experience symptoms of the Subject Vehicle's defects despite Defendant's representations that the Subject Vehicle was repaired.

34.    Under the Song-Beverly Act, Defendant FCA had an affirmative duty to promptly offer to repurchase or replace the Subject Vehicle at the time if failed to conform the Subject Vehicle to the terms of the express warranty after a reasonable number of repair attempts.[4]

---

[4] "A manufacturer's duty to repurchase a vehicle does not depend on a consumer's request, but instead arises as soon as the manufacturer fails to comply with the warranty within a reasonable time. (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 301-302, 45 Cal.Rptr.2d 10.) Chrysler performed the bridge operation on Santana's vehicle in August 2014 with 30,262 miles on the odometer—within the three-year, 36,000 mile warranty. The internal e-mails demonstrating Chrysler's awareness of the safety risks inherent in the bridge operation were sent in September 2013, and thus Chrysler was well aware of the problem when it performed the bridge operation on Santana's vehicle. Thus, Chrysler's duty to repurchase or provide restitution arose prior to the expiration of

6

35. Defendant FCA has failed to either promptly replace the Subject Vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

36. Under the Song-Beverly Act, Plaintiffs are entitled to reimbursement of the price paid for the vehicle less that amount directly attributable to use by the Plaintiffs prior to the first presentation to an authorized repair facility for a nonconformity.

37. Plaintiffs are entitled to replacement or reimbursement pursuant to Civil Code, section 1794, *et seq.* Plaintiffs are entitled to rescission of the contract pursuant to Civil Code, section 1794, *et seq.* and Commercial Code, section 2711.

38. Plaintiffs are entitled to recover any "cover" damages under Commercial Code, sections 2711, 2712, and Civil Code, section 1794, *et seq.*

39. Plaintiffs are entitled to recover all incidental and consequential damages pursuant to 1794, *et seq.* and Commercial Code, sections 2711, 2712, and 2713 et seq.

40. Plaintiffs suffered damages in a sum to be proven at trial in an amount that exceeds $75,000.00.

41. Plaintiffs are entitled to all incidental, consequential, and general damages resulting from Defendants' failure to comply with its obligations under the Song-Beverly Act and/or Magnuson-Moss Warranty Act.

**The Totally Integrated Power Module (TIPM) Defect**

42. The Subject Vehicle was factory-equipped with a Totally Integrated Power Module ("TIPM") which is located under the hood in the vehicle engine compartment. Defendant FCA equipped the Subject Vehicle with a TIPM.

---

the three-year, 36,000 mile warranty. Moreover, although we do not have the actual five-year, 100,000 mile power train warranty in our record, Santana's expert testified that the no-start/stalling issues Santana experienced were within the scope of the power train warranty, which was still active when Santana requested repurchase in approximately January 2016, at 44,467 miles. Thus the premise of Chrysler's argument—that Santana's request for repurchase was outside the relevant warranty—is not only irrelevant, but wrong." *Santana v. FCA US LLC,* 56 Cal. App. 5th 334*, 270 Cal. Rptr. 3d 335 (2020).

**COMPLAINT; JURY TRIAL DEMANDED**

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

43.     The TIPM is the chief component in the Subject Vehicle's power distribution systems and consists of a computer, relays, fuses, and controls. The TIPM provides the primary means of voltage distribution and protection for the entire vehicle and Defendant FCA acknowledges that the TIPM is intended to provide safe, reliable, and centralized distribution of power to the Subject Vehicle's electrical systems.

44.     The electrical systems that receive power distributed by the TIPM include the vehicles' safety systems, security system, ignition system., fuel system, electrical powertrain, and the vehicles' comfort and convenience systems. These systems control components including the air bags, fuel pump, windshield wipers, headlights, taillights, turn signals, and power windows and doors.

45.     The TIPM installed in the Subject Vehicle is defective and thus fails to reliably control and distribute power to various vehicle electrical systems and component parts.

46.     As a result of the TIPM defect, the Subject Vehicle has had the following issues:

     a.     failure to shift; delay upon shifting; whining noise; failure to move; failure and/or replacement of the pistons, retainer, discs, reverse piston seals, and/or flywheel; harsh shifting; required updating and/or reprogramming of the PCM and/or key FOBs; RKE remotes inoperable; failure of the RKE FOBs; clunking noise upon acceleration; transmission slip; failure of the transmission, transmission cooler lines, and/or cooler; failure of the oil cooler unit, engine thermostat, water pump, and/or front struts;

     b.     Multiple electrical issues; and

     c.     Numerous recalls.

47.     The TIPM in the Subject Vehicle is likely to cause a variety of electrical issues such as a loss of headlight function, stalling, and unexpected

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

distractions, such as the vehicle's horn or alarm sounding while on a roadway, which may each increase the risk of injury for the driver, passengers, or others on the roadway. The defective TIPM imposes a substantial safety risk to the operator the vehicle and surrounding drivers.

48.    Defendant FCA has instructed employees in multiple divisions to investigate the TIPM defect. As recently as spring 2012, teams were investigating vehicles equipped with the TIPM not starting, having difficulty starting, and stalling attributed to a malfunction fuel pump relay integral to the TIPM printed circuit board.

49.    The factory-installed TIPM in the Subject Vehicle is the same as, or substantially similar to, the factory-installed TIPM in other models and model years manufactured and/or distributed by Defendant FCA, the defective nature of which Defendant FCA has known or should have known since at least 2007.

## Defendant FCA's Knowledge of the TIPM Defect

50.    Defendant FCA had superior and exclusive knowledge of the TIPM defects and knew or should have known that the defects were not known by or reasonably discoverable by Plaintiff before Plaintiff purchased or leased the Subject Vehicle.

51.    Defendant FCA's knowledge of the TIPM defects since at least 2007 is demonstrated by the numerous consumer complaints submitted to FCAUS LLC and to NHTSA, multiple TIPM-related recalls and technical service bulletins, two NHTSA investigations into TIPM-related complaints, Defendant FCA's exhaustive pre-release vehicle testing, and FCA US LLC's exclusive access to post-sale data about the performance of and repairs made to its vehicles. The use of limited recalls and TSBs as stop-gap measures demonstrates a pattern of concealment and improper denial of the TIPM defect by Defendant FCA.

52.    Defendant FCA vehicles have been plagued with severe TIPM problems for the past decade.

53.     As a result, Defendant FCA has initiated multiple TIPM-related recalls to address safety or emissions concerns.

54.     An automotive manufacturer's service bulletin typically takes time to develop and issue because the manufacturer needs to identify and understand the problem, develop and test the new repair instructions, and draft and finalize the bulletin before distributing it to dealerships.

55.     The defect is so widespread that TIPM replacement parts have often been on national backorder, with drivers reporting from 2011 to 2014 that they had to wait weeks or months to have their TIPMs replaced. In the meantime, Defendant FCA's dealerships and auto-technicians are advising many drivers not to drive their vehicles until the TIPM is replaced, due to safety risks.

56.     The use of limited recalls and TSBs as stop-gap measures to mask symptoms demonstrates a pattern of concealment of the TIPM Defect by Defendant FCA.

57.     For example, TSBs provide information to dealers but not customers. They alert dealers to systemic problems with vehicles, like the TIPM Defect, that require diagnosis and/or repair any time an owner brings the vehicle into the dealership, even for basic maintenance. Similarly, a recall or "field fix" for software can be accomplished secretly, without any public knowledge, because it is accomplished by updating or "flashing" the software for the vehicle. Any time an owner presents his or her vehicle to an authorized repair facility for diagnostics or repairs, the vehicle's PCM is scanned to identify "flashes" that must be performed to update or reprogram any of the electronic control modules.

58.     In October 2005, Defendant FCA issued Recall 5V-461 for model year ("MY") 2006 Dodge Ram 1500 4x4 vehicles to reprogram (i.e., "flash") the TIPM-6 with new software to cure a safety-related defect.

59.     The defect was that the TIPM-6 could have incorrect transfer case calibration set points. As a consequence, the transfer case could shift into neutral

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

without warning and, if the parking brake were not engaged, the vehicle could roll away.

60.    Defendant FCA admitted that because of the defect, "the vehicle could roll away with the transmission in the Park position and cause a crash without warning."

61.    This defect shows that Defendant FCA was aware of the dangerous, life-threatening consequences of a defective TIPM. Yet, despite this knowledge, Defendant FCA manufactured the next generation TIPM, the TIPM-7, without resolving the module's propensity to cause life threatening crashes.

62.    In May 2007, NHTSA's Office of Defect Investigation ("ODI") opened Preliminary Evaluation PE07-027.

63.    The ODI had received 53 consumer complaints alleging incidents of engine stalling in MY 2007 Jeep Wrangler vehicles, prompting the evaluation. Most of the stalls occurred suddenly, and in 12 of them a loss of electrical power causing a loss of vehicle lighting coincided with the stalls.

64.    The purpose of NHTSA's evaluation was to assess the frequency, scope, and safety consequences of the defect in the subject vehicles.

65.    The ODI agreed to close the evaluation when, on July 3, 2007, FCA US LLC agreed to recall approximately 80,894 MY 2007 Jeep Wrangler and MY 2007 Dodge Nitro vehicles (NHTSA Recall 07V-291).

66.    To remedy the stalling problem, Defendant FCA agreed to reprogram the TIPM in the subject vehicles with revised software. Defendant FCA admitted that there was an "issue" with the TIPM "that could result in an engine stall while driving," which could "cause a crash without warning."

67.    At the time the evaluation was closed, the ODI had received 230 consumer complaints, two of which involved crashes and injuries. Defendant FCA had directly received at least 279 complaints by this time.

68.    This recall did not cure all of the TIPM defects in the '2007 Dodge

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

Nitro, as demonstrated by the fact that the 2007 Dodge Nitro was recalled again in November 2009 for a safety defect concerning TIPM-related windshield wiper problems,

69.    Because the same TIPM was installed in the MY 2007 Dodge Nitro as in the Vehicle, this recall demonstrates Defendant FCA's knowledge of the defective TIPM in the Vehicle.

70.    This recall did not resolve the stalling problems caused by the faulty TIPM, as demonstrated by a consumer complaint submitted to NHTSA on February 7, 2008 in which the complainant describes stalling in a MY 2007 Jeep Wrangler after having the recall repairs, and subsequently being told by a dealership service manager that the TIPM had to be replaced to cure the stalling problem (NHTSA ID No. 10217364.)

71.    In June 2007, Defendant FCA released an emission recall, Recall 2007-15-E (G23) on certain vehicles equipped with the TIPM- 7. The recall was conducted to reprogram the vehicles' TIPM to prevent a condition where during some trips the vehicles would have only a single forward gear ratio available. Defendant FCA admitted that "[b]oth emissions and drivability would be affected when vehicle is stuck in one forward gear."

72.    In May 2008, Defendant FCA distributed TSB 08-018-08 to its nationwide network of authorized dealers and service providers.

73.    This TSB is not publicly available, either in summary form or in its entirety, because neither Defendant FCA nor NHTSA classified the TIPM defect addressed in the TSB as a safety defect.

74.    The TSB covered several 2008 MY vehicles equipped with a TIPM-7.

75.    The TIPM defect purportedly resolved by this TSB involved data recording, specifically, the inability to record data because of TIPM software problems.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

76.    The TSB states that "[d]ata recording is a valuable tool that provides assistance in diagnosing difficult to duplicate customer concerns. Some of the[se] models ... were incapable of utilizing the data recording features due to software compatibility concerns within the TIPM." In other words, Defendant FCA admitted internally that owners and lessees of these vehicles would suffer mechanical problems with their vehicles, take the vehicles in for repair, and be told that the on-board computer did not show that any mechanical "event" or "problem" had occurred. Any reasonable consumer who has taken her car in for repairs would view this as a maddening scenario.

77.    It is troubling that this TIPM defect has not been classified as a safety defect. Although the failure to record data itself does not appear to cause a loss of vehicle control and is probably unnoticed by the driver, the failure to record real-time data could fail to record the manifestation of a safety defect, such as stalling, that would present a life-threatening safety hazard. Defendant FCA as well as consumers', ability to detect the manifestation of a safety defect was severely compromised by the inability to record data caused by the defective TIPM.

78.    Because the TIPM installed in these vehicles is the same as in the Vehicle, Defendant FCA was aware - yet again - that the TIPM installed in the Vehicle was defective and chose a stop-gap remedy on a limited set of vehicles.

79.    Because the TSB was not publicly available, owners and lessees of these vehicles were unaware of the issue and many of them likely did not obtain the TIPM repair described in the TSB.

80.    By proceeding with a non-public TSB instead of a publicly announced safety recall, Defendant FCA chose to remain willfully blind about the manifestation of safety defects that a properly functioning TIPM would have enabled the data recorder to record.

81.    Rather than disclose the TIPM problem and offer an adequate solution, Defendant FCA attempted to conceal it by advising its network of

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

**COMPLAINT; JURY TRIAL DEMANDED**

authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

82.    In November 2009, Defendant FCA notified NHTSA of a safety defect affecting the windshield wiper system on certain vehicles equipped with the TIPM-7.

83.    The TIPM was defective in that a relay controlling the wipers could short out, causing the wipers to fail, in turn causing impaired driver visibility increasing the risk of a crash.

84.    Defendant FCA recalled 84,680 vehicles to reprogram the TIPM.

85.    Because the TIPM in the vehicles subject to this recall and in the Vehicle is the same, this recall demonstrates that Defendant FCA knew; at the time that Plaintiff purchased or leased the Vehicle, that the TIPM was defective.

86.    In August 2011, Defendant FCA distributed TSB 08-053-11 to its nationwide network of authorized dealers and service providers.

87.    This TSB is not publicly available, either in summary form or in its entirety, because neither Defendant FCA nor NHTSA have classified the TIPM defect addressed in the TSB as a safety defect.

88.    This TSB covered numerous vehicles equipped with the TIPM.

89.    The TIPM was defective in that the vehicle theft alarm would intermittently sound for no apparent reason and the vehicles would fail to start.

90.    The TSB's purported fix was to flash reprogram the TIPM with new software.

91.    It is troubling that this TIPM defect has not been classified as a safety defect. If a vehicle alarm sounds during regular operation of the vehicle, it could be so jarring and distracting as to cause the driver to lose control of the vehicle. Once again, Defendant FCA chose to address this problem internally rather than conduct a safety recall which would have alerted its customers, NHTSA, and the public to the ongoing, repeated safety problems with the TIPM.

COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

92.    Because the TIPM installed in these vehicles is the same as in the Vehicle, Defendant FCA was aware, once again, that the TIPM installed in the Subject Vehicle was defective, and again chose an inadequate stop-gap remedy on a limited set of vehicles.

93.    Rather than disclose the TIPM problem and offer an adequate solution, Defendant FCA attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

94.    In July 2013, Defendant FCA initiated yet another TIPM-related safety recall. Defendant FCA notified NHTSA that the airbag warning lamp would incorrectly illuminate due to an electrical overstress condition within the Occupant Restraint Controller Module ("ORCM"), which would in turn cause the active head restraints to not deploy in certain rear-impact collisions, thereby increasing the risk of injury to a front seat occupant.

95.    Defendant FCA recalled approximately 442,481 vehicles to flash the TIPM or replace the ORCM, as required. The TIPM was flash reprogrammed in certain vehicles equipped with the TIPM-7.

96.    Once again, this recall evidences Defendant FCA's knowledge of the defective TIPM and shows FCA US LLC's repeated attempts to employ inadequate piecemeal remedies on the Subject Vehicle.

97.    On August 21, 2014, the Center for Auto Safety ("CAS") submitted a defect petition to NHTSA, requesting that NHTSA "initiate a safety defect investigation into failures associated with the [TIPM] installed in FCA US LLC SUCs, trucks, and vans beginning in the 2007 model year." The petition noted that TIPM failures result in a variety of safety-related problems, "many of which have the potential for destructive results," such as stalling, airbag non-deployment, failure of fuel-pump shutoff: and vehicle fires.

98.    CAS had received at least 70 complaints related to the TIPM in FCA

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

**COMPLAINT; JURY TRIAL DEMANDED**

US LLC vehicles and a stall/no-start condition was the most reported outcome of TIPM failure. Seventeen of these complaints report engine stalling and 34 report a failure to start. Two of them report smoke and one reports a vehicle fire.

99.    The CAS petition asserts that FCA US LLC's previous TIPM-related recalls were insufficient "to address the TIPM problem widespread throughout FCA US LLC's fleet, instead focusing on a highly limited set of vehicles and circumstances."

100.    Plaintiff has suffered the consequences of the TIPM failure described by CAS, and Plaintiff agrees with CAS's characterization of the TIPM problem as widespread throughout FCA US LLC's fleet and in the Vehicle.

101.    On September 3, 2014, Defendant FCA notified NHTSA of yet another TIPM-related safety defect. This time, the fuel pump relay within the TIPM could fail, causing stalling without warning or failure to start. In Defendant FCA's words, "[t]he vehicle may intermittently or permanently: not start, not start the first time, not stay running upon start, stall, or the fuel pump may stay energized upon vehicle shutdown," and "[a]n intermittent or failed fuel pump relay could cause the engine to stall while driving and cause a crash without a warning."

102.    The remedy under Recall 14V-530 was to install a new fuel pump relay external to the TIPM. Defendant FCA may have decided that resolving the problem Within the TIPM was not feasible, given the extensive defects and problems within the TIPM.

103.    The recall covered 188,723 vehicles equipped with the TIPM-7.

104.    Yet again, this recall demonstrates Defendant FCA's knowledge that the TIPM in the Subject Vehicle was defective. And again, Defendant FCA chose to implement an inadequate piecemeal remedy.

105.    On September 8, 2014, the CAS supplemented its defect petition with additional consumer complaints about the TIPM. In the supplement, the CAS identified 24 crashes from NHTSA's Early Warning Reporting ("EWR") database

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

that the CAS believes may be related to TIPM failure. Crash reports in the EWR database are submitted by the vehicle manufacturer, demonstrating Defendant FCA's awareness of these crashes.

106.   On. September 25, 2014, NHTSA's ODI opened Investigation DP 14-004 to evaluate the CAS's detect petition. The investigation will "review allegations of [TIPM] failures resulting in engine stall while driving, airbag non-deployment incidents, unintended acceleration and/or vehicle fire in certain ... vehicles ... equipped with TIPM-7 modules and manufactured by FCA US LLC Group LLC[.]"

107.   The ODI investigation covers approximately 4,800,000 vehicles equipped with the TIPM-7.

108.   On September 30, 2014, the CAS submitted another supplement to its defect petition, including approximately 25 new consumer complaints about the TIPM that it had received.

109.   With CAS's submission of its defect petition and supplements, and NHTSA's opening of the investigation, Defendant FCA is aware of an of the TIPM-related complaints made to the CAS. This is in addition to all of the TIPM-related complaints made to NHTSA about which Defendant FCA is, and has been, aware. At the very least, Defendant FCA has constructive knowledge of the consumer complaints submitted to NHTSA, which are publicly available on the NHTSA website.

110.   In response to a request for information by NHTSA, Defendant FCA stated the following in a December 12, 2014 letter to NHTSA:

a.      Defendant FCA had identified 709 reports which relate or may relate to the TIPM in the subject vehicles, representing 199 unique vehicle identification numbers ("VINs").

b.      FCA US LLC had identified 605 consumer complaints, made to FCA US LLC, which relate or may related to the TIPM .in the subject

vehicles, representing 189 unique VINs. Defendant FCA did not specify when it received these complaints.

c.      Defendant FCA had identified 104 Field Reports which relate or-may relate to the TIPM in the subject vehicles: representing 65 unique VINs. Defendant FCA did not specify when it performed these field reports.

d.      Defendant FCA had identified 207 paid warranty claims related to repair or replacement of the TIPM-7 module, representing 126 unique VINs.

111.   In 2013, Defendant FCA conducted a safety recall of 2011 and 2012 model year Dodge Nitro and Jeep Liberty vehicles, through which it would "flash" the vehicles' TIPM. The recall was prompted by the fact that the vehicles could experience illuminated airbag warning lamps and restraints not deploying in collisions.

112.   In that letter, Defendant FCA stated also that it had identified zero reports of crash, fire, injury, or fatality which relates or may relate to the TIPM in the subject vehicles. However, by the date of that letter consumers had submitted to NHTSA at least six reports describing crashes or fires in the relevant vehicles, rendering Defendant FCA's statement erroneous if not intentionally misrepresentative:

a.      On September 7, 2013, a consumer reported that "the TIPM fuse exploded" in a MY 2011 Jeep Grand Cherokee (NHTSA ID No. 10542447);

b.      On March 19, 2014, a consumer reported that the "wires and TIPM started melting and smoking and burned" in a MY 2012 Dodge Ram 5500 (NHTSA ID No. 10573426);

c.      On March 19, 2014, a consumer reported that the TIPM in a MY 2012 Dodge Ram 5500 ha. caught fire for the second time in a week and that the consumer had taken the truck to a dealership after the first fire

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430 LOS ANGELES, CA 90067

(NHTSA ID No. 10573471);

     d.     On June 5, 2014, a consumer reported that a five-car pileup occurred immediately behind her because she stalled in the middle of the road due to a faulty TIPM in a MY 2011 Dodge Durango. (NHTSA ID No. 10596370).

     e.     On September 18, 2014, a consumer reported that her MY 2011 Durango was "smoking" and that a dealership diagnosed the problem as an electrical short in the TIPM (NHTSA ID No. 1063717l).

     f.     On October 30, 2014, a consumer reported a crash caused by a stall in a MY 2008 Jeep Wrangler (NHTSA ID No. 10651411).

113.   Defendant FCA has knowledge of the fact that the defective TIPM installed in the Vehicle is prone to sudden failure because of the numerous complaints that consumers have made to NHTSA.

114.   Owners of vehicles equipped with a TIPM-7 have submitted at least 240 complaints to NHTSA about electrical problems including stalling, headlights turning off, and failure to start—most, if not all, of which occurred with no warning whatsoever to the driver.

115.   By the end of 2011, consumers had submitted over 100 complaints about the TIPM to NHTSA.

116.   Some of these complaints describe dangerous situations, indicating that Defendant FCA is putting the lives of consumers and their passengers at risk. When a defective TIPM suddenly fails without warning, a driver loses the ability to safely operate their vehicle.

117.   Some of the complaints to NHTSA were made prior to the sale of the Vehicle to Plaintiff.

118.   For years, Defendant FCA has monitored drivers' safety-related reports to NHTSA, which can be viewed on the NHTSA's website. There are several hundred complaints on the NHTSA website and elsewhere online dating

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

back to when the TIPM-7 was first introduced in 2007 model year FCA US LLC vehicles.

119.   As early as 2008, drivers of vehicles equipped with the TIPM started contacting NHTSA to complain that their vehicles were experiencing a host of electrical issues, including uncontrollable activity of the windshield wipers, horn, and alarm system, and the headlights and taillights not working. Drivers also complained that their vehicles would not start and that the vehicles would stall without warning. By the end of 2011, over 100 drivers had complained to NHTSA that they had experienced some combination of these symptoms, and dealers were diagnosing the problems as stemming from a defective TIPM, with some dealers saying the TIPM was already on a nationwide backorder.

120.   Defendant FCA's knowledge of the TIPM defect is also demonstrated by the fact that Defendant FCA studied and tracked TIPM-related issues through exhaustive pre-release testing. In recent years, Defendant FCA has tested models for millions of miles before their release. For example, Defendant FCA employees put seven million miles on multiple 2011 Jeep Grand Cherokee test vehicles before production. Given the speed and frequency with which the TIPM defect manifests, it is not plausible that this testing would not have alerted Defendant to the existence of the TIPM defect. Only Defendant FCA however, has access to its pre-release testing data.

121.   Defendant FCA also receives data about how its vehicles are performing in the days, weeks, and months after they are sold. Defendant FCA collects information from both drivers and dealerships, including through complaints, warranty claims, replacement parts data, and other aggregated data sources. Defendant FCA has exclusive access to this information also.

122.   Defendant FCA is collecting old TIPM parts that have been replaced, in an effort to keep those parts away from public scrutiny. Defendant FCA is requiring anyone who wants to purchase a new TIPM from Defendant FCA to

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

1    agree to return to Defendant FCA the old TIPM that is being replaced.

2        123.   This requirement affects non-FCA mechanics and private individuals

3    who seek to keep the original TIPM parts for any reason, including but not limited

4    to examining those parts for defects.

5        124.   In addition, the owners of these vehicles already have paid for the

6    original TIPM parts and should not have to give up their personal property in order

7    to buy a replacement part, this amounts to an abusive tactic.

8        125.   Notwithstanding the history of TIPM problems in its vehicles,

9    Defendant FCA chose to begin installing the TIPM in 2007 model year vehicles

10   and continued to install the TIPM into vehicles through the 2014 model year.

11       126.   Given the repeated, severe problems that plagued the TIPM in its

12   vehicles, Defendant FCA understood that the TIPMs posed a heightened risk of

13   problems for consumers and Defendant FCA was particularly aware of and on the

14   lookout for early indicia of TIPM problems.

15       **Defendant FCA's Failure to Disclose the TIPM Defect**

16       127.   FCA US LLC has never disclosed the TIPM defect to Plaintiff prior

17   to the purchase of the Subject Vehicle or at any point during ownership of the

18   Subject Vehicle and Defendant FCA has never instructed its dealerships to

19   disclose the TIPM defect to drivers or potential purchasers or lessees of vehicles

20   equipped with the TIPM.

21       128.   The TIPM defect was not known or reasonably discoverable to the

22   Plaintiff before purchase or lease, or without experiencing the defect firsthand and

23   exposing themselves to an unreasonable safety risk.

24       129.   Defendant FCA has remained silent even as it issued a service

25   bulletin, conducted internal investigations, and saw the TIPM replacement parts

26   go on national backorder and hundreds of complaints for effected vehicles were

27   lodged with NHTSA.

28       130.   Defendant FCA's refusal to publicly acknowledge the defect has

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

21

created widespread confusion. Defendant FCA's failure to notify consumers, dealerships, or auto-technicians prevents the TIPM problem from being efficiently diagnosed. Drivers often do not realize that the symptoms they are experiencing are due to the TIPM defect or that prompt action is needed to ensure they do not experience stalling, headlight loss, or other dangerous symptoms in the future. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the TIPM defect or advise Plaintiff about the dangers of driving the Subject Vehicle.

131.   As a result of Defendant FCA's inaction and silence, Plaintiff was entirely unaware that Plaintiff purchased, and continues to drive, an unsafe and unreliable vehicle.

132.   As Defendant FCA knows, a reasonable person would consider the TIPM defect important and would not purchase or lease a vehicle equipped with the TIPM defect were the defect disclosed in advance or would pay substantially less for the vehicle.

133.   FCA has still not modified any of the defective components that cause the symptoms associated with the Stalling Defect.

**FIRST CAUSE OF ACTION**

**BY PLAINTIFFS AGAINST DEFENDANT FCA**

**VIOLATION OF SUBDIVISION (D) OF CIVIL CODE § 1793.2**

134.   Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

135.   Defendant FCA and its representatives in this state have been unable to service or repair the Vehicle to conform to the applicable express warranties after a reasonable number of opportunities.  Despite this fact, Defendant failed to promptly replace the Vehicle or make restitution to Plaintiffs as required by Civil Code section 1793.2, subdivision (d) and Civil Code section 1793.1, subdivision (a)(2).

**COMPLAINT; JURY TRIAL DEMANDED**

136.   Plaintiffs have been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2, subdivision (d) and Civil Code section 1793.1, subdivision (a)(2), and therefore brings this cause of action pursuant to Civil Code section 1794.

137.   Defendant's failure to comply with its obligations under Civil Code section 1793.2, subdivision (d) was willful, in that Defendant and its representative were aware that they were unable to service or repair the Vehicle to conform to the applicable express warranties after a reasonable number of repair attempts, yet Defendant failed and refused to promptly replace the Vehicle or make restitution. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs' actual damages pursuant to Civil Code section 1794, subdivision (c).

138.   Defendant does not maintain a qualified third-party dispute resolution process which substantially complies with Civil Code section 1793.22. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs' actual damages pursuant to Civil Code section 1794, subdivision (e).

139.   Plaintiffs seeks civil penalties pursuant to section 1794, subdivisions (c), and (e) in the alternative and does not seek to cumulate civil penalties, as provided in Civil Code section 1794, subdivision (f).

## SECOND CAUSE OF ACTION

## BY PLAINTIFFS AGAINST DEFENDANT FCA

## VIOLATION OF SUBDIVISION (B) OF CIVIL CODE § 1793.2

140.   Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

141.   Although Plaintiffs presented the Vehicle to Defendant's representative in this state, Defendant and its representative failed to commence the service or repairs within a reasonable time and failed to service or repair the Vehicle so as to conform to the applicable warranties within 30 days, in violation of Civil Code section 1793.2, subdivision (b).  Plaintiffs did not extend the time

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

for completion of repairs beyond the 30-day requirement.

142.   Plaintiffs have been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2(b), and therefore brings this Cause of Action pursuant to Civil Code section 1794.

143.   Plaintiffs have rightfully rejected and/or justifiably revoked acceptance of the Vehicle, and has exercised a right to request a buyback.   By serving this Complaint, Plaintiffs do so again.   Accordingly, Plaintiffs seeks the remedies provided in California Civil Code section 1794(b)(1), including the entire value of the Vehicle.   In the alternative, Plaintiffs seeks the remedies set forth in California Civil Code section 1794(b)(2), including the diminution in value of the Vehicle resulting from its defects. Plaintiffs believes that, at the present time, the Vehicle's value is *de minimis.*

144.   Defendant FCA'S failure to comply with its obligations under Civil Code section 1793.2(b) was willful, in that Defendant FCA and its representative were aware that they were obligated to service or repair the Vehicle to conform to the applicable express warranties within 30 days, yet they failed to do so. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs' actual damages pursuant to Civil Code section 1794(c).

### THIRD CAUSE OF ACTION
### BY PLAINTIFFS AGAINST DEFENDANT FCA
### VIOLATION OF SUBDIVISION (A)(3) OF CIVIL CODE § 1793.2

145.   Plaintiffs incorporate by reference the allegations contained in paragraphs set forth above.

146.   In violation of Civil Code section 1793.2, subdivision (a)(3), Defendant failed to make available to its authorized service and repair facilities sufficient service literature and replacement parts to effect repairs during the express warranty period.   Plaintiffs have been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2(a)(3), and

therefore brings this Cause of Action pursuant to Civil Code section 1794.

147.  Defendant's failure to comply with its obligations under Civil Code section 1793.2, subdivision (a)(3) was wilful, in that Defendant knew of its obligation to provide literature and replacement parts sufficient to allow its repair facilities to effect repairs during the warranty period, yet Defendant failed to take any action to correct its failure to comply with the law. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs' actual damages; pursuant to Civil Code section 1794(c).

**FOURTH CAUSE OF ACTION**

**BY PLAINTIFFS AGAINST DEFENDANT FCA**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(CIVIL CODE, § 1791.1; § 1794; § 1795.5)**

148.  Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

149.  Pursuant to Civil Code section 1792, the sale of the Vehicle was accompanied by Defendant's implied warranty of merchantability.  Pursuant to Civil Code section 1791.1, the duration of the implied warranty is coextensive in duration with the duration of the express written warranty provided by Defendant, except that the duration is not to exceed one-year.

150.  Pursuant to Civil Code section 1791.1 (a), the implied warranty of merchantability means and includes that the Vehicle will comply with each of the following requirements:  (1) The Vehicle will pass without objection in the trade under the warranty contract description; (2) The Vehicle is fit for the ordinary purposes for which such goods are used; (3) The Vehicle is adequately contained, packaged, and labelled; (4) The Vehicle will conform to the promises or affirmations of fact made on the container or label.

151.  At the time of entering into the warranty contract, or within one-year thereafter, the Vehicle contained or developed the defects set forth above. The

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

existence of each of these defects constitutes a breach of the implied warranty because the Vehicle (1) does not pass without objection in the trade under the warranty contract description, (2) is not fit for the ordinary purposes for which such goods are used, (3) is not adequately contained, packaged, and labelled, and (4) does not conform to the promises or affirmations of fact made on the container or label.

152.   Plaintiffs have been damaged by Defendant's failure to comply with its obligations under the implied warranty, and therefore brings this Cause of Action pursuant to Civil Code section 1794.

## FIFTH CAUSE OF ACTION
## BY PLAINTIFFS AGAINST DEFENDANT FCA
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

153.   Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

154.   Plaintiffs are "consumer[s]" as defined in the Magnuson-Moss Warranty Act (referred to as "Mag-Moss"), 15 U.S.C. § 2301(3).

155.   Defendant is a "supplier" and "warrantor" as defined in the Mag-Moss Act, 15 U.S.C. § 2301(4), 15 U.S.C. § 2301(5).

156.   The Subject Vehicle is a "consumer product" as defined in the Mag-Moss Act, 15 U.S.C. § 2301(1).

157.   In addition to the express warranty, in connection with the sale of the Vehicle to Plaintiffs, an implied warranty of merchantability was created under California law. The Subject Vehicle's implied warranties were not disclaimed using a Buyer's Guide displayed on the Vehicle; thus any purported disclaimers were ineffective pursuant to 15 U.S.C. § 2308(c).

158.   In accordance with Defendant's warranty, Plaintiffs delivered the Vehicle to Defendant's representatives, including its representatives in this state to perform warranty repairs. Plaintiffs did so within a reasonable time. Each time

Plaintiffs delivered the Vehicle, Plaintiffs notified Defendant and its representative of the characteristics of the defects. However, the representative failed to repair the Vehicle, breaching the terms of the written warranty on each occasion

159.   Defendant violated the Mag-Moss Act when it breached the express warranty and implied warranties by failing to repair the defects and nonconformities, or to repurchase and/or replace the Subject Vehicle.

160.   Plaintiffs performed all terms, conditions, covenants, promises and obligations required to be performed on Plaintiffs' part under the terms of the agreement, express warranty and implied warranty except for those terms and conditions, covenants, promises and obligations or payments for which performance and/or compliance has been excused by the acts and/or conduct of Defendant and/or by operation of law

161.   Plaintiffs have also met all of Plaintiffs' obligations and preconditions to bring this claim, or alternatively it would have been futile for Plaintiffs to do so.

162.   In addition, Plaintiffs have met all of Plaintiffs' obligations for bringing this claim as provided in the written warranties, or alternatively, Defendant does not maintain an informal dispute resolution process for the purpose of resolving claims for breach of the implied warranty of merchantability, and does not maintain an informal dispute resolution process for resolving express warranty claims that complies with the requirements of 15 U.S.C. § 2310(a) and the rules and regulations adopted pursuant thereto by the Federal Trade Commission.

163.   As a direct and proximate result of the acts and omissions of the Defendant, Plaintiffs have been damaged in the form of general, special and actual damages in an amount within the jurisdiction of this Court, according to proof at trial.

**COMPLAINT; JURY TRIAL DEMANDED**

164.   Under the Act, Plaintiffs are entitled to reimbursement of the entire amount paid or payable.

165.   Plaintiffs are entitled to all incidental, consequential, penalties, and general damages resulting from Defendant's failure to comply with their obligations under the Mag-Moss Act.

166.   Plaintiffs have been damaged by Defendant's failure to comply with its obligations under the express warranty, implied warranty, as well as any other violations alleged here, and therefore bring this claim pursuant to 15 U.S.C. §2310(d) and seek remedies available pursuant to Magnuson-Moss Act under California law, including California Civil Code Section 1794 and/or California Commercial Code Sections 2711-2715, and/or other remedies that the Court may deem proper.

167.   Plaintiffs are entitled under the Mag-Moss Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action pursuant to 15 U.S.C. § 2310(d)(2).

## SIXTH CAUSE OF ACTION
## BY PLAINTIFFS AGAINST DEFENDANT FCA
## FRAUDULENT INDUCEMENT – CONCEALMENT

168.   Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

169.   Defendant FCA concealed a known defect from Plaintiffs. The defective component is called the totally integrated power module (or TIPM). The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle-everything from steering and brakes to the alarm, headlights, and the fuel pump.

170.   Since the TIPM controls power to a wide variety of essential vehicle systems, including safety and security systems, the defect often leaves the vehicles

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

incapable of providing reliable or safe transportation. This defect may cause a vehicle to fail to start (or take dozens of attempts before the engine will turn over) because of the defect, and vehicles start up at other times only to stall, sometimes while traveling at high speeds. The TIPM defect has caused headlights and taillights to suddenly shut off. It has also caused horns to honk, car alarms to sound, and windshield wipers to activate all on their own.

171. Defendant FCA concealed and suppressed material facts to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that Defendant FCA was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.

172. Defendant FCA's deceptive omissions infected all purchases and leases of vehicles equipped with the TIPM, regardless of whether the vehicles were used or new at the time of acquisition.

173. As early as 2007, Defendant FCA knew of the TIPM defects, Defendant FCA had ample opportunity to communicate to the public, its dealerships, and government regulators in a fashion that would have informed the car-buying public about the TIPM defects in vehicles equipped with the TIPM. For example, Defendant FCA could have recalled the vehicles.

174. Plaintiffs reasonably, justifiably, and detrimentally relied on Defendant FCA's silence about the TIPM defect when deciding whether to purchase or lease a vehicle equipped with a TIPM, in part because Defendant FCA was, and still is, in a position of superior knowledge about the TIPM defects. Plaintiff reasonably trusted that Defendant FCA would not sell a dangerously defective vehicle or fail to recall those vehicles - or otherwise make widely known that the vehicles were dangerously defective such that current and prospective owners and lessees could make informed decisions to protect themselves and their families.

175. Defendant FCA acted with malice and a willful and conscious

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

disregard for the rights and safety of the Plaintiffs and the public in committing these fraudulent acts.

176.  Defendant FCA had, and still has, a duty to disclose the TIPM defects because they were known and/or accessible only to Defendant FCA, which had superior knowledge and access to the relevant facts, and because Defendant FCA knew that the relevant facts were not known or reasonably discoverable by Plaintiffs.

177.  Under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"),49 U.S.C. §§30101-30183, Defendant FCA had the duty to disclose the TIPM defects to NHTSA, and by extension and implication to the public. Id. §30118(c). If Defendant FCA had disclosed the TIPM defects to NHTSA, NHTSA would have made that information public on its websites (www.safecar.gov and www.nhtsa.dot.gov) and its automobile safety telephone hotline.

178.  Defendant FCA still has not made full and adequate disclosure and continues to defraud Plaintiffs by concealing material information regarding the TIPM defects that exist in the Vehicle and the risks posed by those defects.

179.  Defendant FCA actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would have hurt the brand's image and cost Defendant FCA money, and it did so at the expense of Plaintiffs.

180.  Because Defendant FCA knew that any reasonable consumer would not purchase a vehicle with a defective TIPM, or would pay only substantially less for that vehicle, and Defendant FCA was concealing material information about the TIPM defects, Defendant FCA must have known that Plaintiffs were acting on the basis of mistaken knowledge that their vehicles were safe and reliable when they decided to purchase or lease them at market price (without a discount to reflect that they contained a defective TIPM).

181.  Plaintiffs are reasonable consumers who interacted with FCA's sales

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

representatives and/or reviewed materials disseminated by Defendant concerning Defendant's Vehicles prior to purchasing the Vehicle. Had Defendant disclosed the TIPM Defect, a safety hazard, to its sales representatives and/or the consumer public, Plaintiffs would have been aware of it and would not have leased or purchased the Vehicle. Plaintiffs could not have discovered the TIPM defect because Defendant FCA kept all testing information confidential.

182. Defendant FCA actively concealed an important fact from Plaintiffs or prevented them from discovering that fact and as a result, Plaintiffs did not know about the TIPM defect.

183. Defendant FCA intended to deceive Plaintiffs by continuing to market the Vehicle and concealing the existence of a known TIPM defect which posed major safety concerns.

184. Had the information been disclosed, Plaintiffs reasonably would have behaved differently.

185. Plaintiffs were harmed by Defendant FCA's concealment of the TIPM defect and was a substantial factor in causing Plaintiffs' harm. The concealment substantially influenced Plaintiffs' purchase of the Subject Vehicle. Plaintiffs would not have purchased the Subject Vehicle had the TIPM defect been disclosed prior to sale.

186. The concealed TIPM defect was material.

187. Furthermore, Plaintiffs unknowingly exposed themselves to the risk of liability, accident and injury as a result of Defendant's fraudulent concealment of the TIPM Defect.

## PRAYER

PLAINTIFFS PRAYS for judgment against Defendant as follows:

    a.    For general, special, and actual damages according to proof;

    b.    For restitution;

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

c.   For any consequential and incidental damages;

d.   For revocation of acceptance of the Subject Vehicle, rescission, reimbursement and/or restitution of all monies expended;

e.   For diminution in value;

f.   For a civil penalty in the amount of two times Plaintiffs' actual damages pursuant to Civil Code section 1794, subdivision (c) or (e);

g.   For punitive damages;

h.   For prejudgment interest at the legal rate;

i.   For costs of the suit and Plaintiffs' reasonable attorneys' fees pursuant to Civil Code section 1794, subdivision (d);

j.   For costs, expenses and attorney's fees reasonably incurred in connection with the commencement and prosecution of this action pursuant to 15 U.S.C. § 2310(d)(2); and

k.   For such other relief as the Court may deem proper.

Dated: January 11, 2022          STRATEGIC LEGAL PRACTICES, APC


BY:      _____*/s/: Tionna Dolin*_____
              TIONNA DOLIN
              Attorneys for Plaintiffs,
              PETER SUM, HONG KONG
              DIAMOND BAKERY, INC., and
              DIAMOND BAKERY, INC.

**COMPLAINT; JURY TRIAL DEMANDED**

## <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand a jury trial on all causes of action asserted herein.


Dated: January 11, 2022          STRATEGIC LEGAL PRACTICES, APC


                                 BY: _____*/s/: Tionna Dolin*_____
                                      TIONNA DOLIN
                                      Attorneys for Plaintiffs,
                                      PETER SUM, HONG KONG
                                      DIAMOND BAKERY, INC., and
                                      DIAMOND BAKERY, INC.

Strategic Legal Practices, APC
1840 Century Park East, Suite 430, Los Angeles, CA 90067

**COMPLAINT; JURY TRIAL DEMANDED**